UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| WENDY L. MORRIS and LINDA W. BELLAMY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>TRUIST FINANCIAL CORPORATION, TRUIST INVESTMENT SERVICES, INC., and TRUIST BANK,<br><br>Defendants. | § § § § § § § § § § § § § § § § | Civil Action No. [Insert]<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Wendy L. Morris and Linda W. Bellamy (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this class action against Defendants Truist Financial Corporation ("TFC"), Truist Investment Services, Inc. ("TIS" or "Truist"), and Truist Bank (collectively, "Defendants"), based upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel, including, but not limited to, review and analysis of: (a) contracts between the parties and other documents in Plaintiffs' possession; (b) public documents created and distributed by Defendants; and (c) publicly available information concerning Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. Plaintiffs bring this class action on behalf of Defendants' customers to recover damages arising out of Defendants' wrongful conduct. From October 28, 2020 to the present ("Class Period"), Defendants offered brokerage services to customers nationwide. These services included an automatic cash sweep program known as the Truist Investment Services, Inc. Sweep Program ("Program").

2. Under the Program, Defendants automatically swept customer cash into a network of Program Banks they selected, including Truist Bank ("Program Banks"). The Program is highly lucrative for Defendants, allowing them to gain access to customer cash that federal law otherwise prohibits broker-dealers from using to fund their business operations.

3. In exchange for this access to restricted customer cash, Defendants agreed to pay customers interest rates that "will vary" and are determined by "business conditions" and the amounts Program Banks are "willing to pay" (*i.e.*, short-term market interest rates). The laws governing retirement accounts further prohibit Defendants from using customer cash for their own benefit, except under limited exemptions that require, among other things, that deposits "bear a reasonable interest rate."

4. Instead, Defendants paid Program customers in non-managed accounts unreasonable, near-zero interest rates that were not determined by business conditions, were far below the short-term, market rates Program Banks were willing to pay, and failed to vary with historical increases in such rates. Defendants currently pay, for example, rates as low as 0.01%, which are essentially no interest at all and far lower than contemporaneous market rates.

5. Defendants also retained unreasonable fees representing a disproportionate share of the economic value generated by customer cash, even though the Program Documents treat retirement account fees as appropriate only if they are "reasonable in light of the services provided" and the laws governing retirement accounts require that Defendants receive "no

more than reasonable compensation." The difference, or "spread," between the minuscule rates paid to customers and the fees and other benefits extracted from the use of customers' cash generates impermissible windfall profits for Defendants.

## II. JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction under 28 U.S.C. §1332(d)(2), as amended by the Class Action Fairness Act of 2005. There are at least 100 members in the proposed Class (defined below), the aggregated claims of the individual Class members exceed $5,000,000, exclusive of interest and costs, and at least one member of the proposed Class is a citizen of a State different from that of at least one Defendant.

7. This Court has personal jurisdiction over Defendants because, during the Class Period, Defendants had offices in, did substantial business in, had sufficient contacts with, and intentionally availed themselves of the laws and markets of this District through the promotion, sale, marketing, distribution, and operation of their products and services in this District, and many of the acts and practices complained of herein occurred in substantial part in North Carolina.

8. Venue is proper in this District pursuant to 28 U.S.C. §1391 because Defendants are headquartered in and/or transacted substantial business in this District, and a substantial part of the acts and practices complained of herein occurred in this District.

## III. PARTIES

### A. Plaintiffs

9. Plaintiff Wendy L. Morris is a Virginia citizen residing in Dillwyn, Virginia, who held a traditional IRA and an individual TOD (transfer-on-death) brokerage account at Truist. Cash balances in Ms. Morris's Truist accounts were, at times, automatically "swept" into the Program's TIS Tiered Rate Multibank Sweep Feature (Non-Managed Accounts)

(QTMNQ) ("Multibank Sweep Feature"), and she received below-market and unreasonably low interest on those deposits.

10. Plaintiff Linda W. Bellamy is a Florida citizen residing in Sarasota, Florida, who held a rollover IRA at Truist. Cash balances in Ms. Bellamy's Truist account were, at times, automatically "swept" into the Program's Multibank Sweep Feature, and she received below-market and unreasonably low interest on those deposits.

**B. Defendants**

11. Defendant Truist Financial Corporation is a North Carolina corporation headquartered at 214 North Tryon Street, Charlotte, North Carolina 28202. TFC is one of the largest financial services firms in the United States, with assets totaling approximately $556.0 billion, loans and leases held for investment totaling approximately $329.8 billion, and approximately 37,800 full-time equivalent employees. TFC is the parent company and control person of TIS and Truist Bank.

12. Defendant Truist Investment Services, Inc. is a Georgia corporation headquartered at 303 Peachtree Street, 2nd Floor, Atlanta, Georgia 30303. TIS is a broker-dealer registered with the U.S. Securities and Exchange Commission ("SEC") and a member of the Financial Industry Regulatory Authority that offers brokerage and investment services to its nationwide client base. During the Class Period, TIS acted as agent for the establishment, maintenance, and operation of the Program. TIS is a wholly owned subsidiary of, and controlled by, TFC, and is an affiliate of Truist Bank, with which it shares TFC as its common parent.

13. Defendant Truist Bank is a North Carolina state-chartered commercial bank, headquartered at 214 North Tryon Street, Charlotte, North Carolina 28202. Truist Bank is one of the ten largest commercial banks in the United States. Truist Bank is one of the Program Banks and also serves as an agent and sub-custodian to establish interest-bearing deposit

accounts at Federal Deposit Insurance Corporation ("FDIC")-insured Program Banks ("Deposit Accounts") and settle deposit and withdrawal transactions. Truist Bank is a wholly owned subsidiary of, and controlled by, TFC, and is an affiliate of TIS, with which it shares TFC as its common parent.

14. TFC, TIS, and Truist Bank all receive direct and significant financial benefits from the Program, as discussed below. Additionally, TFC files consolidated financial reports with the SEC incorporating the financial results of TIS and Truist Bank. TFC reports $1.431 billion in annual "wealth management income" for 2025, a category that includes retail investment and brokerage services such as the Program, and $400.4 billion in total deposits as of December 31, 2025.

15. TFC, TIS, and Truist Bank share the same corporate website (truist.com) and corporate logo, while TFC and Truist Bank also share the same headquarters (214 North Tryon Street, Charlotte, North Carolina 28202). TFC and Truist Bank also share corporate officers and directors, including Michael P. Lyons (current President, Chief Executive Officer, and Director) and William H. Rogers, Jr. (current Executive Chair and Director and previously Chief Executive Officer and President).

## IV. FACTUAL BACKGROUND

### A. Background on the Program

16. A "sweep program" is a "service provided by a broker or dealer where it offers to its customer the option to automatically transfer free credit balances [*i.e.*, cash] in the securities account of the customer to either a money market mutual fund product as described in § 270.2a-7 of this chapter or an account at a bank whose deposits are insured by the Federal Deposit Insurance Corporation." 17 C.F.R. §240.15c3-3(a)(17).

17. Sweep deposits play an important role as a capital source for banks, enabling them to utilize otherwise restricted cash deposits for various corporate purposes. In turn, banks

pay broker-dealers as intermediaries for aggregating and placing the deposits with the banks. The difference between the interest rates paid to broker-dealers' customers on sweep accounts and the interest rates banks pay for those deposits is commonly referred to as the "spread." It is reported in financial statements as net interest income, which contributes to the broker-dealer's reported net interest margin.

18. Brokerage account customers generally hold some assets in cash, and these balances tend to remain untouched for long periods of time. Because of the "stickiness" (also known as stability or duration) of deposit accounts, swept deposits are a valuable deposit franchise for brokerage businesses.

19. Defendants offer the Program as the default automatic cash sweep program for TIS's brokerage accounts. The terms and conditions of the Program are set forth in the Truist Sweep Program Disclosure Statement ("Disclosure Statement"). The Disclosure Statement, TIS's Customer Relationship Summary ("Form CRS"), and TIS's Investing Guide are incorporated by reference into TIS's Brokerage Account Customer Agreement, applicable to both taxable and retirement accounts, and TIS's Customer Agreement, applicable to certain retirement accounts ("Retirement Account Agreement") (collectively, "Program Documents"). The Brokerage Account Customer Agreement is governed by North Carolina law, while the Retirement Account Agreement is governed by Massachusetts law.[1]

---

[1] *See* Truist Investment Services, Inc., Brokerage Account Customer Agreement (Dec. 2022), https://www.truist.com/content/dam/truist-bank/us/en/documents/disclosures/wealth/client-agreement-non-qualified-qualified-private-label.pdf (governed by North Carolina law); Truist Investment Services, Inc., Customer Agreement (Dec. 2020) (Retirement Account Agreement), https://www.truist.com/content/dam/truist-bank/us/en/documents/disclosures/wealth/traditional-roth-select-ira-premiere-customer-agreement.pdf (governed by Massachusetts law).

20. The Form CRS states that TIS accounts "utilize the Sweep Program service as the core account cash investment vehicle,"[2] and describes the Program as a "cash sweep investment service" through which customers' available cash balances are "automatically invested" in Deposit Accounts at Program Banks, including Truist Bank.[3]

21. Under the Disclosure Statement, TIS offers the Program in conjunction with National Financial Services LLC and Fidelity Management Trust Company (collectively, "NFS"), affiliates of Fidelity Investments ("Fidelity") engaged by TIS to provide custody and clearing services for the Program.[4] On information and belief, IntraFi LLC, a financial services and technology company, also participates in the administration of the Program on behalf of TIS and NFS.

22. NFS, on behalf of TIS, acts as agent and custodian for the Deposit Accounts, and uses Truist Bank as an agent and sub-custodian to establish Deposit Accounts at the Program Banks and settle deposit and withdrawal transactions.[5] Under the Multibank Sweep Feature, which applies to non-managed taxable accounts and IRA accounts, customer cash is allocated among Program Banks according to a ranked list of Program Banks that TIS selects and maintains ("Priority List").[6] Before funds are placed with Program Banks in accordance

---

[2] Truist Investment Services, Inc. & Truist Advisory Services, Inc., Client Relationship Summary, at 3 (July 31, 2026) (Form CRS), https://www.truist.com/content/dam/truist-bank/us/en/documents/disclosures/wealth/tis-tas-form-crs.pdf.

[3] *Id.* at 1.

[4] *See* Truist Investment Services, Inc., Truist Sweep Program Disclosure Statement, at 1, https://www.truist.com/content/dam/truist-bank/us/en/documents/disclosures/wealth/tis-sweep-program-disclosure-statement.pdf (last visited Oct. 26, 2026).

[5] *See id.* at 6.

[6] Truist Investment Services, Inc., TIS Multibank Sweep Feature Priority Bank Lists (effective June 30, 2026), https://www.truist.com/content/dam/truist-bank/us/en/documents/disclosures/wealth/tis-multibank-priority-list.pdf. The Priority List currently includes the following Program Banks: Truist Bank; Goldman Sachs Bank USA; U.S. Bank National Association; UBS Bank USA, N.A.; Pinnacle Bank; Deutsche Bank Trust Company Americas; JPMorgan Chase Bank, National Association; The Huntington

with the Priority List, NFS transfers them to Truist Bank, which, as the sub-custodian, places them with those Program Banks on the same business day, and settles deposit and withdrawal transactions with the Program Banks each business day.[7] Under the Truist Bank Single Bank Level Rate Sweep Feature (Non-Managed Accounts) (QPERQ) ("Single Bank Sweep Feature"), which applies to non-managed Employee Retirement Income Security Act of 1974 ("ERISA") retirement plan accounts, TIS deposits customer cash in Deposit Accounts at Truist Bank alone.[8]

23. The Program Documents confirm that TIS acts as each customer's agent in operating the Program. Both the Brokerage Account Customer Agreement and the Retirement Account Agreement state that TIS is "acting as [the customer's] agent" in connection with the customer's account.[9] The Disclosure Statement likewise provides that "TIS, as your agent, will open" Deposit Accounts "on your behalf" at the Program Banks and will "deposit available cash balances" into those accounts; that "[w]ithdrawals from your Deposit Accounts can only be made by TIS as your agent"; and that customers "will have no direct access" to their Deposit Accounts.[10]

24. In exchange for receiving sweep deposits under the Program, the Program Banks negotiate with Defendants on an arm's-length basis and agree to pay interest rates that vary with short-term, market interest rates. The Disclosure Statement explains that interest

---

National Bank; Barclays Bank Delaware; Synchrony Bank; Manufacturers and Traders Trust Company; State Street Bank and Trust Company; BMO Bank National Association; American Express National Bank; State Bank of India; The Bank of East Asia Ltd.; Bank of Baroda; PNC Bank, National Association; and Citibank, National Association.

7 *See* Disclosure Statement, *supra* note 4, at 6.

8 *See id.* at 2.

9 Brokerage Account Customer Agreement, *supra* note 1, §2, at 1; Retirement Account Agreement, *supra* note 1, §1, at 1.

10 Disclosure Statement, *supra* note 4, at 2-4.

accrues daily and is credited monthly, and that interest rates on Deposit Accounts are determined by the amounts Program Banks are "willing to pay on the Deposit Accounts minus any fees or other consideration paid to Truist Bank and other parties."[11]

25. The Disclosure Statement further provides that "[i]nterest rates may change daily," and that the rates "will vary . . . among the Bank Deposit Sweep Features and may be changed at any time without notice."[12]

26. Additionally, the Brokerage Account Customer Agreement and Retirement Account Agreement both state that "[i]nterest rates earned on Eligible Sweep Features which are bank deposits are determined by Truist Bank in its sole discretion based upon business conditions and Truist Bank's own commercial interests and, in the case of Eligible Sweep Features which pay tiered rates of interest, will vary based upon your Brokerage Account balances deposited in each Eligible Sweep Feature."[13] The phrase "business conditions" is generally understood in the financial industry to refer to macroeconomic conditions, including the prevailing short-term interest-rate environment. Read together with the "willing to pay" and "will vary" rate provisions, it required customer rates to vary with the market rates Program Banks paid on an arm's-length basis, not with Defendants' pecuniary whims.

27. The fees and other benefits Defendants received from the Program were in exchange for providing intermediary services (*i.e.*, aggregating and placing customer deposits with the Program Banks). The value of these services is determined on an open and developed market, wherein Defendants negotiate their fees with the Program Banks on an arm's-length basis. The negotiated fees are paid by the Program Banks to Truist Bank, which in turn pays

---

11 *Id.* at 5-6.

12 *Id.* at 6.

13 Brokerage Account Customer Agreement, *supra* note 1, §19, at 5; Retirement Account Agreement, *supra* note 1, §23, at 5.

TIS an annual fee of up to $100 on a per-account basis for accounts enrolled in the Program. As the Disclosure Statement explains:

- All Program Banks will pay fees that will be retained by Truist Bank. In its discretion, Truist Bank may reduce its fee and may vary the amount of the reductions between clients. The fee may vary from Bank to Bank.[14]

- TIS receives fees and other benefits in connection with the Bank Deposit Sweep Features. TIS receives an annual fee of up to $100 from Truist Bank on a per-Account basis in connection with Accounts enrolled in the Bank Deposit Sweep Features. TIS may pay all or a portion of its fees to NFS and other service providers.[15]

28. The Retirement Account Agreement further provides that "my Broker/Dealer [TIS] and NFS are able to receive compensation with respect to amounts invested in my Core Account" and "I have been provided a description of these fees and represent that these fees are reasonable in light of the services provided."[16]

29. The fees retained by Defendants inversely impact the rates paid to customers, such that higher fees mean lower rates, and vice versa. As the Disclosure Statement states, "[t]he amount of the fee received by Truist Bank will affect the interest rate paid by the Program Bank on your Deposit Accounts" and "[l]ower rates on the Deposit Accounts are financially beneficial to Truist Bank."[17] The Form CRS further states that "[t]here is an incentive to maintain a cash sweep service in which uninvested cash is deposited with our affiliate [Truist

---

[14] Disclosure Statement, *supra* note 4, at 8.

[15] *Id.* at 7.

[16] Retirement Account Agreement, *supra* note 1, §23, at 6.

[17] Disclosure Statement, *supra* note 4, at 8; *see also id.* at 7 ("Truist Bank determines the fees it receives from the other Program Banks, which affects the interest rate paid on your Deposit Accounts"); *id.* at 6 ("[l]ower rates are more financially beneficial to Truist Bank and the other Program Banks").

Bank], and we also receive financial benefits in connection with deposits at other program banks."[18]

30. In short, the greater the amount of cash balances maintained under the Program, and the lower the rates of interest paid on these cash balances, the more Defendants benefit. Based on these adverse incentives, and in violation of the Program Documents, Defendants paid Program customers with non-managed (*i.e.*, non-advisory) accounts below-market and unreasonably low interest rates (as low as 0.01%), while commandeering fees for themselves that were far greater than the market value of the intermediary services they provided, rather than "reasonable in light of the services provided."[19] Moreover, TIS was only entitled to "up to $100 from Truist Bank on a per-Account basis in connection with Accounts enrolled in the Bank Deposit Sweep Features,"[20] but wrongfully received far more than that based on the spread from market interest rates paid by the Program Banks, which sharply increased during the Class Period while interest rates paid to Program customers remained far below market.

31. In addition to fees, the Disclosure Statement describes benefits that Truist Bank receives from the Program based on its use of "substantial deposits (including Reciprocal Deposits) at a price that may be less than other alternative funding sources available to it." These deposits "provide a stable source of funds for Truist Bank," which it "intends to use . . . to support a variety of activities, including, but not limited to, its lending activities, investments, and other business activities, if any."[21] "The participation of Truist Bank in the Sweep Program is expected to increase its deposits and, accordingly, overall profits."[22]

[18] Form CRS, *supra* note 2, at 3.

[19] Retirement Account Agreement, *supra* note 1, §23, at 6.

[20] Disclosure Statement, *supra* note 4, at 7.

[21] *Id.* at 8.

[22] *Id.*

32. The Program is also structured to favor Truist Bank by designating it as the "Excess Deposit Bank" under the Multibank Sweep Feature, meaning it "will accept your funds without limit and without regard to the FDIC insurance limit" once other Program Banks reach their deposit limits.[23] And, "unlike other Program Banks, pursuant to the terms of the Sweep Program, Truist Bank cannot be excluded by you from your Account's Priority List."[24] Moreover, under the Single Bank Sweep Feature, customer cash is deposited only at Truist Bank "without limit and without regard to the $250,000 FDIC insurance limit."[25]

33. Additionally, the Disclosure Statement acknowledges that "[t]he management personnel and other employees of TIS and its affiliates, including Truist Bank, receive incentive compensation based, in part, on the profitability of the Sweep Program to TIS, Truist Bank, and their joint parent company, Truist Financial Corporation."[26]

34. Customers had no direct relationship with the Program Banks and were required to obtain any information from Defendants, including the identities of the Program Banks, which Defendants listed online.[27] The Disclosure Statement provides that "all transactions with respect to your Deposit Accounts must be directed by TIS and all information concerning your Deposit Accounts can only be obtained from TIS."[28] Defendants exercised full discretion and control over cash deposited by customers, including selecting which Program Banks the swept cash was sent to, and determining the interest rates customers received and the fees Defendants retained. As detailed further below, Defendants exercised their broad discretion in an arbitrary

---

[23] *Id.* at 3.

[24] *Id.*

[25] *Id.* at 2.

[26] *Id.* at 8.

[27] Priority List, *supra* note 6.

[28] Disclosure Statement, *supra* note 4, at 7.

and bad faith manner to deprive customers of the benefit of their participation in the Program in order to capture the increased spread for themselves.

### B. Defendants Paid Below-Market and Unreasonably Low Rates of Interest Under the Program

35. The definition of "reasonable" as it appears in the Merriam-Webster dictionary is as follows: "being in accordance with reason, fairness, duty, or prudence"; "of an appropriate degree or kind"; or "supported or justified by fact or circumstance."[29]

36. A reasonable rate of interest is, at bottom, the rate that would result in a competitive market under fair market valuation conditions, *i.e.*, a rate parties would agree to in an arm's-length transaction where neither party was able to exert market power over the other.

37. "Fair market value" ordinarily represents "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction."[30] Similarly, "fair market value" is defined by the U.S. Internal Revenue Service ("IRS") as "the price that would be agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts."[31]

38. The U.S. Department of Labor, in a 2003 prohibited transaction exemption granted under ERISA Section 408(a) and Internal Revenue Code ("IRC") Section 4975(c)(2), has defined a "reasonable" rate of interest as "a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as

---

[29] *Reasonable*, Merriam-Webster, https://www.merriam-webster.com/dictionary/reasonable (last visited Oct. 26, 2026).

[30] "Fair Market Value," *Black's Law Dictionary* (11th ed. 2019).

[31] Internal Revenue Service, Publication 561, *Determining the Value of Donated Property* (Dec. 2025), https://www.irs.gov/publications/p561.

repurchase agreements, or by reference to a benchmark such as sovereign short-term debt (*e.g.*, in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated."[32]

39. Similarly, in assessing funds transfer pricing (FTP) between related entities, the IRS defines an "arm's length interest rate" as "a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances." 26 C.F.R. §1.482-2(a)(2)(i). In making this determination, "[a]ll relevant factors shall be considered, including the principal amount and duration of the loan, the security involved, the credit standing of the borrower, and the interest rate prevailing at the situs of the lender or creditor for comparable loans between unrelated parties." *Id.* In such a way, sweep deposit transfers placed with an affiliate bank require the same market-based rate as sweep deposit transfers placed with an unaffiliated bank.

40. Consistent with these commonsense definitions, a competitive, varying, market-based, and reasonable sweep rate is one that takes into account market rates commonly associated with bank cash funding such as short-term instruments like repurchase (or reverse repo) agreements, short-dated Certificates of Deposit, U.S. Department of the Treasury ("Treasury") bills, wholesale and brokered deposits, government money market funds, and short-term interest reference rates like the federal funds rate ("FFR"), Secured Overnight Financing Rate ("SOFR"), and/or the London Interbank Offered Rate. These short-term market interest rates are highly correlated, as shown in the graph below:

[32] Prohibited Transaction Exemption No. 2003-11, §III(f), 68 Fed. Reg. 34648 (June 10, 2003), https://www.federalregister.gov/documents/2003/06/10/03-14594/grant-of-individual-exemptions-deutsche-bank-ag.




41. By a variety of objective measures, the Program paid far below-market and unreasonable interest rates to non-managed accountholders in the Program throughout the Class Period. Although the Program Documents state that interest rates "will vary" and are determined by "business conditions" and what the Program Banks are "willing to pay," the rates paid to Plaintiffs and the Class were well below market, not meaningfully variable with short-term rates, and failed to track historical increases in the short-term interest-rate environment, such as the FFR.[33]

42. The following table presents a non-exhaustive sample of annual percentage yields ("APYs") during the Class Period under the Program's Multibank Sweep Feature:[34]

| Rate Tier (per Deposit Balance) | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|
| $0-$49,999.99 | 0.01% | 0.01% | 0.01% | 0.92% | 1.24% | 0.01% | 0.01% |

[33] *See* Disclosure Statement, *supra* note 4, at 5-6; Brokerage Account Customer Agreement, *supra* note 1, §19, at 5; Retirement Account Agreement, *supra* note 1, §23, at 5.

[34] *See* Truist Investment Services, Inc., *Sweep Deposit Program Rates*, https://www.truist.com/content/dam/truist-bank/us/en/documents/disclosures/wealth/sweep-program-current-rates.pdf (last visited Oct. 26, 2026).

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| $50,000-$249,999.99 | 0.01% | 0.01% | 0.01% | 1.12% | 1.46% | 0.05% | 0.01% |
| $250,000-$999,999.99 | 0.01% | 0.01% | 0.01% | 2.21% | 2.65% | 0.20% | 0.05% |
| $1,000,000-$2,499,999.99 | 0.01% | 0.01% | 0.01% | 3.06% | 3.65% | 0.65% | 0.10% |
| $2,500,000-$4,999,999.99 | 0.01% | 0.01% | 0.01% | 3.06% | 3.65% | 0.80% | 0.15% |
| $5,000,000+ | 0.01% | 0.01% | 0.01% | 3.06% | 3.65% | 1.36% | 0.25% |

43. The following table presents a non-exhaustive sample of APYs during the Class Period under the Program's Single Bank Sweep Feature:[35]

| | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | **2026** |
|---|---|---|---|---|---|---|---|
| Level Rate (All Balances) | 0.01% | 0.01% | 0.01% | 3.06% | 3.65% | 1.36% | 0.25% |

44. The data above show that Defendants have paid, and continue to pay, accountholders APYs as low as 0.01% at various times during the Class Period. Over the same period, market rates rose substantially and far exceeded Defendants' rates, as discussed below.

**1. Federal Funds Rates**

45. The FFR is the unsecured overnight rate at which depository institutions lend reserve balances to one another, and is calculated by the Federal Reserve as the volume-weighted median interest rate charged by banks on overnight lending.[36] Changes in the FFR quickly affect interest rates that banks and other lenders charge on short-term loans. Thus, when the FFR increases, yields on market-based cash investments increase as well. The FFR is an important, administered policy benchmark referenced in many wholesale funding

---

[35] *See id.*

[36] Federal Reserve Bank of New York, *Effective Federal Funds Rate*, https://www.newyorkfed.org/markets/reference-rates/effr (last visited Oct. 26, 2026).

arrangements, including cash sweep programs. In short, the FFR is one of the most important factors driving the global economy.

46. Defendants have failed to pass through substantial increases in the FFR during the Class Period. Between March 2022 and July 2023, the Federal Reserve increased the FFR target range 11 times, moving from 0.25%-0.50% in March 2022 to 5.25%-5.50% in July 2023.[37] The FFR target range currently stands at 3.75%-4.00%.[38] In contrast, rates paid to accountholders in the Program have been far lower, including APYs currently ranging from 0.01% to 0.25%.

### 2. SOFR and Other Federal Benchmark Rates

47. In addition to the FFR, the rates paid under the Program have been and remain significantly below several other federal benchmark rates, such as SOFR and Treasury bill rates, which serve as objective *indicia* of reasonableness.

48. The SOFR measures the cost of borrowing cash overnight collateralized by Treasury securities and is calculated from a very large volume of actual repurchase transactions.[39] It is widely regarded as the best measure of the marginal cost of secured overnight funding in U.S. dollar markets. Importantly, the SOFR is a market rate that Federal Reserve publications emphasize is the most representative measure of short-term funding conditions precisely because it is grounded in actual trades, rather than quotes or estimates.[40]

---

[37] Board of Governors of the Federal Reserve System, *Open Market Operations*, https://www.federalreserve.gov/monetarypolicy/openmarket.htm (last visited Oct. 26, 2026).

[38] *Id.*

[39] Federal Reserve Bank of New York, *Secured Overnight Financing Rate Data*, https://www.newyorkfed.org/markets/reference-rates/sofr (last visited Oct. 26, 2026).

[40] Federal Reserve Bank of New York, *An Updated User's Guide to SOFR* (Feb. 2021), https://www.newyorkfed.org/medialibrary/Microsites/arrc/files/2021/users-guide-to-sofr2021-update.pdf.

49. The rates paid under the Program consistently have been and remain unreasonably low and uncompetitive relative to the SOFR and other federal instruments. As with the FFR, these instruments have experienced sharp increases since 2022, but rates paid to customers in the Program have been and remain significantly below these objective *indicia* of reasonableness. For example: (a) the 180-day average SOFR is currently at 3.66%;[41] (b) three-month and one-year Treasury bill rates are currently at 4.08% and 4.27%, respectively;[42] and (c) the Federal Reserve's overnight reverse repurchase agreement award rate (the "repo rate") is currently at 3.75%.[43]

50. For purposes of illustration, the following charts depict the one-year and three-month Treasury bill rates between 2017 and today:




[41] SOFR Academy, *Market Data*, https://sofracademy.com/current-sofr-rates/ (last visited Oct. 26, 2026).

[42] Federal Reserve Bank of St. Louis, *3-Month Treasury Bill Secondary Market Rate, Discount Basis*, https://fred.stlouisfed.org/series/DTB3 (last visited Oct. 26, 2026); Federal Reserve Bank of St. Louis, *1-Year Treasury Bill Secondary Market Rate, Discount Basis*, https://fred.stlouisfed.org/series/DTB1YR (last visited Oct. 26, 2026).

[43] Federal Reserve Bank of St. Louis, *Overnight Reverse Repurchase Agreements Award Rate*, https://fred.stlouisfed.org/series/RRPONTSYAWARD (last visited Oct. 26, 2026).




51. The repo rate similarly increased together with the FFR beginning in 2022. For purposes of illustration, the graph below depicts the repo rates between 2017 and today.




52. As depicted above, the repo rate, like other short-term interest rate benchmarks, has remained far above the rates paid under the Program.

### 3. Rates Paid by Competitors and Other Products

53. Competitor sweep programs are governed by different contractual arrangements and business structures, many of which may also involve structural, rate-depressing conflicts of interest. Nevertheless, sweep rates offered by other financial institutions highlight the uncompetitiveness and unreasonableness of rates paid to customers in the Program, which are among the lowest in an already uncompetitive industry.

54. While every cash sweep program is unique, the disparity in yield between the Program's rates and those of Defendants' competitors illustrates that Defendants operated the

Program to serve their own interests rather than the interests of their customers. For example, even though their rates were themselves not fully market-based, competitive, or reasonable, Fidelity's FDIC-Insured Deposit Sweep Program paid an interest rate of 2.69%,[44] and The Vanguard Group, Inc.'s ("Vanguard") Bank Sweep Program paid an APY of 3.7%,[45] at certain times during the Class Period. The fact that these rates far exceeded Defendants' rates shows how far Defendants were willing to go to place their financial interests above those of their clients.

55. Even more damning is the fact that Truist Bank and several other Program Banks[46] also participate in the Fidelity and/or Vanguard sweep programs paying far higher rates than Defendants' Program, including American Express National Bank (Vanguard); Citibank, National Association (Fidelity and Vanguard); Goldman Sachs Bank USA (Fidelity); JPMorgan Chase Bank; National Association (Fidelity); Pinnacle Bank (Vanguard); PNC Bank, National Association (Vanguard); Synchrony Bank (Vanguard); U.S. Bank National Association (Vanguard and Fidelity); UBS Bank USA, N.A. (Vanguard); The Huntington National Bank (Vanguard and Fidelity); and Bank of Baroda (Vanguard).[47]

---

[44] Fidelity Investments, *Interest Rates: FDIC-Insured Deposit Sweep Program*, https://digital.fidelity.com/prgw/digital/fdic-interest-rate/ira.

[45] The Vanguard Group, Inc., *Vanguard Cash Plus Account*, https://investor.vanguard.com/investment-products/vanguard-cash-deposit.

[46] Priority List, *supra* note 6.

[47] Fidelity, *FDIC-Insured Deposit Sweep Program*, https://accountopening.fidelity.com/ftgw/aong/aongapp/fdicBankList# (last visited Oct. 26, 2026); *Vanguard Bank Sweep Program Bank List* (Sep. 2026), https://personal1.vanguard.com/pdf/Bank_Sweep_Participating_Banks.pdf.

56. Fidelity also offers to automatically sweep customers' cash into a money market mutual fund with a current seven-day yield of 3.33%.[48] Vanguard offers to automatically sweep customers' cash into one of five money market mutual funds with current seven-day yields ranging from 2.59% to 3.71%.[49]

57. Like Fidelity and Vanguard, Defendants could have automatically swept cash to a money market mutual fund paying significantly higher rates than the Program. Money market mutual funds are strictly regulated by the SEC and can only be sold pursuant to prospectuses, which disclose the sponsor's profits on the use of investor cash. In contrast, Defendants' Program is a black box that does not disclose the significant spread between the rates paid on customer cash and the FFR or the rates paid by competitors, as discussed above. While Defendants offer a "Money Fund Feature" that sweeps cash to a money market mutual fund, it is available only to "[c]ertain non-U.S. Accounts, Keogh Plans, and other Accounts"[50] that are not covered by the Bank Deposit Sweep Features discussed herein, and, thus, is not provided as an automatic sweep option to most customers.

58. Under any reasonable interpretation and construction, Defendants failed to pay market-based or reasonable rates to customers in the Program.

---

[48] Fidelity, *Fidelity® Government Money Market Fund*, https://fundresearch.fidelity.com/mutual-funds/summary/31617H102 (last visited Oct. 26, 2026).

[49] Vanguard, *Products & services, Money market funds*, https://investor.vanguard.com/investment-products/money-markets (last visited Oct. 26, 2026).

[50] Disclosure Statement, *supra* note 4, at 2.

### C. Defendants Breached Their Contractual Obligations Related to the Program

59. Defendants breached several express and implied contractual obligations by failing to pay competitive, reasonable, market-based interest rates, and by extracting unreasonable fees that commandeered monies owed to Program participants.

60. The Brokerage Account Customer Agreement and Retirement Account Agreement both promised that interest rates will be determined by "business conditions" and the Disclosure Statement promised that interest rates will be determined by the amounts Program Banks were "willing to pay" (minus fees or other consideration paid to Truist Bank and other parties) and "will vary."[51] These representations created an express contractual obligation to pay variable, market-based rates that were actually based on the amounts Program Banks were willing to pay.

61. Upon information and belief, the Program Banks paid market-based rates to Defendants. However, Program rates lagged far behind and failed to increase with those rates, as Defendants chose to retain fees representing a disproportionate share of the economic value generated by customer cash. Indeed, as shown in the table above (¶39), Defendants paid rates as low as 0.01% at various times throughout the Class Period, even while short-term market interest rates increased dramatically. Accordingly, Defendants breached their express contractual obligations to provide variable, market-based interest rates to Program customers based on business conditions and what the Program Banks were willing to pay.

62. With respect to fees, the Disclosure Statement provided: "All Program Banks will pay fees that will be retained by Truist Bank. In its discretion, Truist Bank may reduce its fee and may vary the amount of the reductions between clients. The fee may vary from Bank

---

[51] Brokerage Account Customer Agreement, *supra* note 1, §19, at 5; Retirement Account Agreement, *supra* note 1, §23, at 5; Disclosure Statement, *supra* note 4, at 5-6.

to Bank."[52] Additionally, the Disclosure Statement states that "TIS receives an annual fee of up to $100 from Truist Bank on a per-Account basis in connection with Accounts enrolled in the Bank Deposit Sweep Features."[53] Moreover, the Retirement Account Agreement provides that "my Broker/Dealer [TIS] and NFS are able to receive compensation with respect to amounts invested in my Core Account" and "I have been provided a description of these fees and represent that these fees are reasonable in light of the services provided."[54]

63. Because the Program was to be a market-based investment that utilized customer cash that Defendants were legally prohibited from accessing for their own purposes, and customer returns were to be dictated by participating Program Banks and the short-term market interest rate environment, Defendants' fees taken from that amount were required to be market-based and reasonable, reflecting the true value of the intermediary services they actually performed, not their pecuniary whims.

64. Instead, Defendants retained excessive fees in violation of their contractual obligations. In particular, TIS wrongfully received far more than "up to $100 from Truist Bank on a per-Account basis in connection with Accounts enrolled in the Bank Deposit Sweep Features,"[55] based on the spread it received from market interest rates paid by the Program Banks, which sharply increased during the Class Period while interest rates paid to Program customers remained far below market. Moreover, the excessive fees retained by Defendants for the intermediary services they performed for Program customers were not "reasonable in light of the services provided,"[56] as required by the Retirement Account Agreement.

---

[52] Disclosure Statement, *supra* note 4, at 8.

[53] *Id.* at 7.

[54] Retirement Account Agreement, *supra* note 1, §23, at 6.

[55] Disclosure Statement, *supra* note 4, at 7.

[56] Retirement Account Agreement, *supra* note 1, §23, at 6.

65. Defendants also owed all customers in the Program contractual duties under the implied covenant of good faith and fair dealing, which required Defendants to exercise discretion conferred by the Program in good faith and in a manner consistent with customers' reasonable expectations under the Program.

66. The Program conferred discretion on Defendants in the operation of the Program, including discretion over the selection of participating Program Banks, the placement and movement of customer cash, and the establishment and application of interest rate tiers. Defendants violated these duties when they acted in bad faith and abused their discretion by using their control over the Program to pay customers below-market and unreasonably low sweep interest rates while retaining unreasonably high portions of the economic value generated by customers' cash. The rates paid to customers were far below the FFR, Treasury and repo rates, money market fund rates, and comparable sweep programs, even as those rates rose dramatically.

67. By operating the Program in the manner alleged herein, Defendants acted opportunistically and in bad faith, frustrated customers' reasonable expectations under the Program, and deprived customers of the principal benefit of the Program, including the full, expected benefit of their bargain under the Program. Moreover, Defendants willfully and knowingly concealed from customers material information about the true operation of the Program and how the Program substantially enriched Defendants at customers' expense, including the amounts paid by the Program Banks and the portions of such amounts that Defendants retained as fees.

68. Defendants also breached provisions of the IRC and ERISA, which are repeatedly referenced and effectively incorporated in the Retirement Account Agreement. The Retirement Account Agreement states, for example, that changes to a bank sweep product are

made in accordance with “applicable rules and regulations, including the Internal Revenue Code and ERISA.”[57]

69. Section 4975 of the IRC states that “prohibited transaction[s]” involving a retirement plan include any direct or indirect “transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan”; “act by a disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account”; or “receipt of any consideration for his own personal account by any disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan.”[58] A “disqualified person” under Section 4975 of the IRC includes a “fiduciary” and “a person providing services to the [retirement] plan.”[59]

70. Summarizing IRC rules concerning individual retirement arrangements, IRS Publication 590-B states that “disqualified persons include your fiduciary,” such as anyone who “[e]xercises any discretionary authority or discretionary control in managing your IRA or exercises any authority or control in managing or disposing of its assets,” and that “prohibited transaction[s]” are “any improper use of your IRA account or annuity by you, your beneficiary, or any disqualified person.”[60]

71. TIS and Truist Bank were “disqualified person[s]” under Section 4975 of the IRC because, among other things, they provided services to retirement account customers in connection with the Program and exercised discretionary authority over the placement of their assets. Because they were disqualified persons, cash sweeps from retirement accounts to the

---

[57] *Id.*

[58] 26 U.S.C. §4975(c)(1)(D)-(F).

[59] 26 U.S.C. §4975(e)(2)(A)-(B).

[60] Internal Revenue Service, *Distributions from Individual Retirement Arrangements (IRAs)*, Publication 590-B, at 22 (2025), https://www.irs.gov/pub/irs-pdf/p590b.pdf.

Program Banks, for the benefit of Defendants, were "prohibited transactions" under Section 4975 of the IRC.

72. The IRC provides limited exemptions to otherwise prohibited transactions, including "the investment of all or part of a plan's assets in deposits which bear a reasonable interest rate in a bank or similar financial institution supervised by the United States or a State," subject to specified statutory conditions, and "the provision of any ancillary service by a bank or similar financial institution supervised by the United States or a State," provided, among other things, that "such service is provided at not more than reasonable compensation."[61] Under the Program, however, cash sweeps were not exempt under Section 4975 because Program customers were not paid reasonable interest rates, and Defendants received unreasonably high fees that did not reflect the true value of the intermediary services performed, as discussed above.

73. Similarly, Section 408 of ERISA exempts party-in-interest transactions involving the investment of retirement plan assets in bank deposits only if those deposits bear "a reasonable rate of interest," and exempts arrangements with service providers only if "no more than reasonable compensation" is paid for their services.[62] These exemptions did not apply because customers were not paid reasonable sweep interest rates and Defendants received unreasonably high compensation, contrary to the Retirement Account Agreement's representation that such compensation was "reasonable in light of the services provided."[63]

74. In other words, the IRC and ERISA permit retirement-account sweeps to depository institutions affiliated with the broker-dealer, which would otherwise be prohibited

---

[61] 26 U.S.C. §4975(d)(4), (6).

[62] 29 U.S.C. §1108(b)(2), (4).

[63] Retirement Account Agreement, *supra* note 1, §23, at 6.

transactions, only if the interest rates paid and fees retained are reasonable. If they are not, the sweeps fall outside the statutory exemptions, and Defendants have no contractual right to monetize customer cash in that manner. Therefore, Defendants' cash sweeps from retirement accounts contravened the IRC and ERISA and, thereby, breached the Retirement Account Agreement.

### D. Defendants Breached Their Fiduciary Duties Related to the Program

75. In addition to violating their contractual obligations, Defendants breached their fiduciary duties. Under the Program Documents, TIS and Truist Bank agreed to act as agents for Program customers, as discussed above, and Defendants assumed fiduciary obligations through their conduct.

76. Defendants jointly acted as agents and fiduciaries by exercising managerial discretion over cash deposits in the Program, including by unilaterally opening, approving, and monitoring customers' Deposit Accounts; choosing the participating Program Banks and the order in which they received customer cash; setting the interest rates and interest rate tiers; and collecting fees from Program Banks in connection with the Program.

77. As their customers' agents and fiduciaries in connection with the Program, Defendants owed fiduciary duties, including duties arising under common law and under Regulation Best Interest, 17 C.F.R. §240.15l-1, which individually and collectively required them to act in their retail customers' best interests, prohibited them from placing their own interests ahead of their retail customers' interests, and obligated them to consider reasonably available alternatives as part of determining whether recommending a given product to investors was appropriate.[64]

---

[64] SEC, *Regulation Best Interest: The Broker-Dealer Standard of Conduct*, 84 Fed. Reg. 33318, 33320 (July 12, 2019) (codified at 17 C.F.R. §240.15l-1), https://www.govinfo.gov/content/pkg/FR-2019-07-12/pdf/2019-12164.pdf; SEC, *Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Care*

78. As the SEC explains, Regulation Best Interest applies to any "account recommendation," which relates to "whether the communication reasonably could be viewed as a call to action."[65] Here, Defendants rendered account recommendations by marketing the Program to customers as a "service" and an "investment" that "permits you to earn interest on your funds pending investment in longer term investment products,"[66] automatically defaulting customers into the Program, directly opening Deposit Accounts for customers, and automatically sweeping customer cash into the Program. These recommendations by Defendants individually and collectively implicated Regulation Best Interest.

79. Thus, by acting as agents and fiduciaries for customers in the Program, and effectively making account recommendations to participate in the Program, Defendants owed fiduciary duties to Program customers, including duties of loyalty, candor, due care, prudence, good faith, and full and fair disclosure. Indeed, the Form CRS acknowledges that "[w]hen we provide you with a recommendation as your broker-dealer . . . we have to act in your best interest and not put our interest ahead of yours,"[67] and the Investing Guide states that "TIS has a duty to act in your best interest."[68]

---

*Obligations* (Apr. 20, 2023), https://www.sec.gov/about/divisions-offices/division-trading-markets/broker-dealers/staff-bulletin-standards-conduct-broker-dealers-investment-advisers-care-obligations.

[65] SEC, *Frequently Asked Questions on Regulation Best Interest* (June 26, 2024), https://www.sec.gov/rules-regulations/staff-guidance/trading-markets-frequently-asked-questions/faq-regulation-best.

[66] Disclosure Statement, *supra* note 4, at 1.

[67] Form CRS, *supra* note 2 at 3.

[68] Truist Investment Services, Inc., Investing Guide, at 2, 23 (July 1, 2026), https://www.truist.com/content/dam/truist-bank/us/en/documents/disclosures/wealth/tis-investing-guide.pdf.

80. Defendants breached these duties by placing their own interests ahead of their customers' interests, including by paying below-market and unreasonably low interest rates to customers while extracting excessive and unreasonable fees for themselves.

81. The duty of full and fair disclosure required Defendants to disclose all material facts relating to the relationship, including all conflicts of interest that might incline Defendants – consciously or unconsciously – to operate the Program in a manner that was not in customers' best interests. While Defendants acknowledged certain conflicts arising from the Program, they failed to adequately disclose the full economics of the Program, including the rates paid by the Program Banks, the fees retained by Defendants, and the impact on customer returns.

82. Defendants also breached their duties to deal fairly and honestly with Plaintiffs and the Class by making material misrepresentations and omissions in the Program Documents, as discussed below, and by failing to exercise reasonable care to verify the truthfulness of the information in those documents.

### E. Defendants Made Material Misrepresentations and Omissions Regarding the Program

83. Defendants made material misrepresentations and omissions concerning the Program because, as discussed above, the Program was not operated in the manner Defendants described. The Program Documents falsely stated that interest rates would be determined by "business conditions" and the amounts Program Banks were "willing to pay," and that they "will vary."[69] In reality, the rates were far below the short-term market interest rates the Program Banks were willing to pay, and failed to vary with short-term market interest rates, remaining as low as 0.01% APY during the Class Period.

---

[69] Brokerage Account Customer Agreement, *supra* note 1, §19, at 5; Retirement Account Agreement, *supra* note 1, §23, at 5; Disclosure Statement, *supra* note 4, at 5-6.

84. Defendants also falsely stated that TIS would receive "up to $100 from Truist Bank on a per-Account basis in connection with Accounts enrolled in the Bank Deposit Sweep Features,"[70] and misled customers into believing that Defendants' fees were "reasonable in light of the services provided."[71] Instead, Defendants retained excessive and unreasonable fees for the intermediary services they provided by retaining the spread received from market interest rates paid by the Program Banks, which sharply increased during the Class Period while interest rates paid to Program customers remained far below market.

85. Moreover, in the Program Documents, Defendants made material omissions by failing to disclose: (a) what rates the Program Banks paid in exchange for the use of customer cash swept into the Program; (b) the portions of such payments that Defendants were commandeering as fees; and (c) that Defendants established and used the Program to enrich themselves by paying below-market and unreasonably low interest rates to customers in order to increase their financial benefits.

86. Although Defendants disclosed that the Program provides significant benefits to them, that they have conflicts of interest, that fees affect customer rates, and that the Program Banks do not have to offer the highest rates available or rates comparable to money market fund yields,[72] these disclosures were insufficient because they failed to disclose material facts concerning the nature of the Program, including what rates the Program Banks paid in exchange for the use of customer cash swept into the Program, the specific spread between what Program Banks paid and what customers received, the total amount and rate of Defendants' actual fees, and that the customer rates were not in fact varying with short-term market interest rates (*i.e.*,

---

[70] Disclosure Statement, *supra* note 4, at 7.

[71] Retirement Account Agreement, *supra* note 1, §23, at 6.

[72] *See* Disclosure Statement, *supra* note 4, at 1, 5-7.

what the Program Banks were willing to pay) despite express representations in the Program Documents that they would. As such, Program customers reasonably understood that the published Program interest rates were market-based, varying rates based on business conditions and what the Program Banks were willing to pay, and could not have known that Defendants were capturing the increased spread for themselves.

## V. CLASS ACTION ALLEGATIONS

87. Plaintiffs bring this action against Defendants as a class action pursuant to Rule 23(a) and (b)(1)-(3) of the Federal Rules of Civil Procedure, on behalf of:

> All customers of Defendants who had cash deposits or balances in the TIS Tiered Rate Multibank Sweep Feature (Non-Managed Accounts) (QTMNQ) and/or the Truist Bank Single Bank Level Rate Sweep Feature (Non-Managed Accounts) (QPERQ) of the Truist Investment Services, Inc. Sweep Program from October 28, 2020 to the present (the "Class").

88. Excluded from the Class are Defendants, including any of their affiliates, officers and directors, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

89. Plaintiffs reserve the right to amend the Class definition upon conducting further investigation or discovery.

90. **Numerosity.** The members of the Class are so numerous that their individual joinder is impracticable. While the exact number of members of the Class can only be determined by appropriate discovery, Plaintiffs believe that the members of the Class number in the many thousands and are geographically dispersed.

91. **Commonality.** There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members. These

common legal and factual questions, each of which may also be certified under Rule 23(c)(4) of the Federal Rules of Civil Procedure, include the following:

(a) whether Defendants owed fiduciary duties to Plaintiffs and the other Class members, as alleged herein;

(b) whether Defendants breached their fiduciary duties to Plaintiffs and the other Class members, as alleged herein;

(c) whether Defendants breached the contractual terms of their account agreements and other written communications to Class members;

(d) whether Defendants breached the implied covenant of good faith and fair dealing;

(e) whether the interest rates paid to Class members under the Program were fair and reasonable;

(f) whether Defendants were unjustly enriched by their wrongful conduct;

(g) whether this case may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

(h) whether and to what extent Plaintiffs and the other Class members have sustained damages and the proper measure of damages; and

(i) whether and to what extent Plaintiffs and the other Class members are entitled to attorneys' fees and costs.

92. **Typicality.** Plaintiffs' claims are typical of the claims of the other Class members because Plaintiffs' cash deposits were subject to the Program, and, therefore, Plaintiffs' claims, and those of all other members of the Class, arose from the same wrongful conduct by Defendants alleged herein.

93. **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel experienced and competent in complex class

action litigation. Plaintiffs have no interests that are contrary to, or in conflict with, those of the members of the Class that Plaintiffs seek to represent.

94. **Predominance & Superiority.** Absent a class action, most Class members would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication. The damages or other financial detriment suffered by Plaintiffs and putative Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the proposed Class to individually seek redress for Defendants' wrongful conduct.

95. **Final Declaratory or Injunctive Relief.** Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making injunctive or corresponding declaratory relief appropriate for the Class as a whole.

## VI. CLAIMS ALLEGED

### FIRST CAUSE OF ACTION

**Breach of Contract**

**(On Behalf of Plaintiffs and the Class)**

96. Plaintiffs reallege and incorporate by reference the allegations set forth above.

97. Plaintiffs and members of the Class were parties to the Program Documents with Defendants. The Program Documents set forth the contractual terms and conditions of the Program.

98. Plaintiffs and members of the Class performed all of their obligations under the Program Documents, including any obligations related to opening and maintaining their accounts and the payment of any applicable commissions or fees.

99. The Program Documents included the following contractual terms, among others:

- That interest rates on Deposit Accounts are determined by the amount Program Banks are willing to pay minus fees or other consideration paid to Truist Bank and other parties. (Disclosure Statement).

- Interest rates earned on Eligible Sweep Features which are bank deposits are determined by Truist Bank in its sole discretion based upon business conditions and Truist Bank's own commercial interests. (Brokerage Account Customer Agreement and Retirement Account Agreement).

- That interest rates may change daily, will vary among Bank Deposit Sweep Features and interest-rate tiers, and may be changed at any time without notice. (Disclosure Statement).

- All Program Banks will pay fees that will be retained by Truist Bank. In its discretion, Truist Bank may reduce its fee and may vary the amount of the reductions between clients. The fee may vary from Bank to Bank. The amount of the fee received by Truist Bank will affect the interest rate paid by the Program Bank on your Deposit Accounts. (Disclosure Statement).

- TIS receives fees and other benefits in connection with the Bank Deposit Sweep Features. TIS receives an annual fee of up to $100 from Truist Bank on a per-Account basis in connection with Accounts enrolled in the Bank Deposit Sweep Features. TIS may pay all or a portion of its fees to NFS and other service providers. (Disclosure Statement).

- [M]y Broker/Dealer [TIS] and NFS are able to receive compensation with respect to amounts invested in my Core Account and that I should review the appropriate prospectus or disclosure document for additional information. I have been provided a description of these fees and represent that these fees are reasonable in light of the services provided. (Retirement Account Agreement).

100. Yet, in reality, the interest rates paid to Program customers were not based on "business conditions" or the amounts Program Banks were "willing to pay," and did not "vary"

in accordance with short-term market interest rates; rather, they were determined based on Defendants' motivation to earn profits at the expense of their customers, and remained far below market even as short-term market interest rates paid by Program Banks increased precipitously. Indeed, the sweep interest rates provided by Defendants were unreasonably low and well below several objective benchmarks including the FFR, which increased dramatically during the Class Period while the interest rates paid to customers in the Program lagged far behind and remained well below market.

101. Moreover, Defendants extracted excessive fees from the Program that were neither market-based nor "reasonable in light of the services provided." Because the Program was to be a market-based investment that utilized customer cash that Defendants were legally prohibited from accessing for their own purposes, and customer returns were to be dictated by participating Program Banks and the short-term market interest rate environment, the fees taken from that amount were required to be market-based and reasonable, reflecting the true value of the intermediary services Defendants actually performed, not their own economic interests. Further, the fees retained by TIS far exceeded "an annual fee of up to $100 from Truist Bank on a per-Account basis" based on the spread it received from market interest rates paid by the Program Banks, which sharply increased during the Class Period while interest rates paid to Program customers remained far below market.

102. As such, Defendants denied Plaintiffs and the Class the full benefit of their bargain under the Program Documents.

103. As a direct and proximate result of Defendants' breaches of contract, Plaintiffs and the Class sustained damages because they did not receive reasonable, market interest rates.

## SECOND CAUSE OF ACTION

**Breach of Implied Covenant of Good Faith and Fair Dealing**

**(On Behalf of Plaintiffs and the Class)**

104. Plaintiffs reallege and incorporate by reference the allegations set forth above.

105. Plaintiffs and members of the Class were parties to the Program Documents with Defendants. The Program Documents set forth the contractual terms and conditions of the Program.

106. The Program Documents vested Defendants with discretion over, among other things, the selection of Program Banks, the allocation and placement of customer cash, the establishment of interest rate tiers, the determination of sweep rates, and the assessment or allocation of sweep-related fees and consideration. Implicit in the Program Documents were duties of good faith and fair dealing, including that the fees taken would be market-based and reasonable, reflecting the true value of the intermediary services Defendants actually performed, not their own economic interests.

107. Defendants exercised their contractual discretion to maintain artificially low and below-market sweep rates while retaining, diverting, or allocating to themselves the substantial economic value generated by customer cash, including through fees or other consideration that reduced the rates credited to customers, even as short-term, market interest rates and comparable cash sweep programs increased significantly.

108. Even if Plaintiffs and the Class could have anticipated some disparity between Program rates and market rates when they opened their accounts, they reasonably expected that, going forward, as the amounts Program Banks were willing to pay increased with the short-term interest-rate environment, the interest rates Defendants credited to them would increase as well. The opposite occurred: the disparity widened dramatically as market rates

rose beginning in 2022 and as Defendants reduced Program rates in 2025 and 2026 while market rates remained elevated.

109. As such, Defendants acted in bad faith and for their own financial benefit rather than for the purposes contemplated by the Program Documents. In doing so, Defendants denied Plaintiffs and the Class the full benefit of their bargain under the Program Documents, frustrated their objectively reasonable contractual expectations, and breached their good faith and fair dealing duties by operating the Program to maximize Defendants' retained fees and benefits rather than to credit customers with reasonable, market rates tied to business conditions and the amounts Program Banks were willing to pay.

110. As a direct and proximate result of Defendants' breaches of the implied covenant of good faith and fair dealing, Plaintiffs and the Class sustained damages because they did not receive reasonable, market interest rates.

## THIRD CAUSE OF ACTION

**Breach of Fiduciary Duty**

**(On Behalf of Plaintiffs and the Class)**

111. Plaintiffs reallege and incorporate by reference the allegations set forth above.

112. During the Class Period, Defendants were the agents and fiduciaries of customers enrolled in the Program, including Plaintiffs. Defendants also facilitated the Program by establishing Deposit Accounts, settling deposits and withdrawals, and collecting fees from Program Banks in connection with the Program.

113. Defendants owed fiduciary duties to Plaintiffs and the Class under common law, including duties of loyalty, candor, due care, prudence, good faith, and full and fair disclosure, and duties to act in the best interests of, and deal fairly and honestly with, Plaintiffs and the Class.

114. Defendants also owed fiduciary duties arising under Regulation Best Interest, which required them to act in their retail customers' best interests and prohibited them from placing their own interests ahead of their retail customers' interests.

115. Defendants violated their duties to act in the best interests of Plaintiffs and the Class by using the Program to enrich themselves at the expense of customers who were paid unreasonably low interest rates, as described above.

116. Defendants also violated their duties to deal fairly and honestly with Plaintiffs and the Class by making material misrepresentations and omissions in the Program Documents, as described above.

117. Further, Defendants violated their duties to act with reasonable care to verify the truthfulness of the information set forth in the Program Documents, which were materially misleading and omitted material facts for the reasons described above.

118. As a direct and proximate result of Defendants' breaches of fiduciary duties, Plaintiffs and the members of the Class suffered damages and are entitled to recover such damages from Defendants.

**FOURTH CAUSE OF ACTION**

**Negligent Misrepresentations and Omissions**

**(On Behalf of Plaintiffs and the Class)**

119. Plaintiffs reallege and incorporate by reference the allegations set forth above.

120. During the Class Period, Defendants were the agents of customers enrolled in the Program, including Plaintiffs and the Class. Defendants also facilitated the Program by accepting payments from customers through their brokerage platform, which were swept into the Program. Defendants shared in the compensation earned from the Program. Defendants also facilitated the Program by establishing Deposit Accounts, settling deposits and withdrawals, and collecting fees from Program Banks in connection with the Program.

121. Defendants owed Plaintiffs and the members of the Class a duty to act with reasonable care in connection with their cash sweep balances deposited and maintained in the Program.

122. Defendants negligently made material misrepresentations and omissions in the Program Documents. In the Program Documents, Defendants represented that interest rates are determined by "business conditions" and the amounts Program Banks are "willing to pay," and that interest rates "will vary." Defendants also represented that fees are "reasonable in light of the services provided" and that TIS's fee is limited to an "annual fee of up to $100 from Truist Bank on a per-Account basis."

123. In reality, Defendants unilaterally decided to pay below-market, unreasonably low interest rates to customers despite a sharply rising market interest-rate environment, and extracted fees far greater than $100 annually per account that were unreasonable in light of the intermediary services provided. Additionally, the Program Documents failed to disclose what the Program Banks were willing to pay or the proportion of such payments that Defendants were commandeering as fees.

124. Plaintiffs and the Class justifiably relied on Defendants' Program Documents and accordingly deposited and maintained cash balances in the Program to their detriment.

125. Defendants' material misrepresentations and omissions directly and proximately caused harm to Plaintiffs and the members of the Class.

## <u>FIFTH CAUSE OF ACTION</u>

### Unjust Enrichment

### (On Behalf of Plaintiffs and the Class)

126. Plaintiffs reallege and incorporate by reference the allegations set forth above.

127. Defendants financially benefited from the unlawful acts alleged herein by paying Plaintiffs and the Class unreasonably low, below-market interest on their balances in the Program.

128. More specifically, Defendants retained an unreasonable amount of fees for themselves and unreasonably lowered customer interest rates to far below market rates in order to retain greater financial benefits for themselves.

129. Among other things, Defendants used their discretion over Program Bank selection, cash placement, interest rate tiers, sweep rates, and sweep-related fees to pay customers below-market and unreasonably low sweep rates while retaining the economic value generated by customer cash, even as short-term interest rates and comparable sweep rates rose dramatically.

130. As a result of the unlawful acts alleged herein, Defendants were unjustly enriched at the expense of Plaintiffs and the Class.

131. Defendants have received, and are holding, funds belonging to Plaintiffs and the Class, which in equity Defendants should not be permitted to keep and should be required to refund to Plaintiffs and the members of the Class.

## SIXTH CAUSE OF ACTION

**Violation of the North Carolina Unfair and Deceptive Trade Practices Act,**

**N.C. Gen. Stat. §75-1.1**

**(On Behalf of Plaintiffs and the Class)**

132. Plaintiffs reallege and incorporate by reference the allegations set forth above.

133. At all relevant times, Defendants' operation of the Program constituted "business activities, however denominated," in or affecting commerce within the meaning of N.C. Gen. Stat. §75-1.1(b), including by offering, maintaining, administering, and receiving fees and revenue from the Program, a bank deposit sweep service through which customer cash was placed in interest-bearing Deposit Accounts at FDIC-insured Program Banks, including

Truist Bank. That service was part of the regular, day-to-day business for which Defendants are organized. Upon information and belief, the conduct alleged herein, including the setting of Program rates and the retention of fees, was directed from North Carolina, where TFC and Truist Bank are headquartered and where TIS maintains offices. In addition, the Brokerage Account Customer Agreement and other Program Documents incorporated therein are governed by North Carolina law.

134. Defendants' acts and practices with respect to the Program constituted unfair or deceptive acts or practices in or affecting commerce, which are declared unlawful by N.C. Gen. Stat. §75-1.1(a). In the course of their business, Defendants unfairly paid below-market and unreasonably low rates to customers while retaining, diverting, or allocating to themselves unreasonable and excessive fees from the Program. Defendants' practices with respect to the Program were immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiffs and the Class.

135. Defendants' conduct involved an inequitable assertion of their power and position over customers, which they leveraged to pay unreasonable, below-market interest rates to Program customers and retain for themselves the economic value generated by customers' cash. Moreover, Defendants' conduct was accompanied by substantial aggravating circumstances, including deception through the concealment of facts alleged herein, including the rates paid by Program Banks, the amounts of fees retained by Defendants, and the spread between such rates and fees.

136. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiffs and the Class suffered injury and damages, including the loss of reasonable interest that should have been credited on their Program balances and the corresponding economic value Defendants wrongfully retained through excessive and unreasonable fees.

137. Based on the foregoing, Plaintiffs and the Class are entitled to all remedies available under North Carolina law, including actual damages, which are to be trebled pursuant to N.C. Gen. Stat. §75-16; reasonable attorneys' fees pursuant to N.C. Gen. Stat. §75-16.1, because Defendants willfully engaged in the acts and practices alleged herein and there has been an unwarranted refusal by Defendants to fully resolve the matter; costs; and all other relief the Court deems just and proper.

## VII. REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for relief and judgment, as follows:

A. Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

B. Ordering Defendants to pay all damages, including actual damages, punitive damages, treble damages, and restitution to Plaintiffs and the other Class members, as allowable by law;

C. Ordering disgorgement of profits obtained by Defendants as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D. Ordering injunctive relief prohibiting Defendants from continuing to engage in the conduct alleged herein;

E. Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded;

F. Ordering Defendants to pay attorneys' fees and costs of suit; and

G. Ordering such other and further relief as may be just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims so triable.

DATED: November 1, 2026


HIGGINS BENJAMIN, PLLC
ROBERT N. HUNTER, JR.

***s/ Robert N. Hunter, Jr.***

ROBERT N. HUNTER, JR.
N.C. Bar No. 5679
301 North Elm Street, Suite 800
Greensboro, NC 27401
Telephone: 336/273-1600
336/274-4650 (fax)
rnhunterjr@greensborolaw.com

ROBBINS GELLER RUDMAN & DOWD LLP
STEPHEN R. ASTLEY*
Florida Bar No. 139254
ANDREW T. REES*
Florida Bar No. 062247
ALEXANDER C. COHEN*
Florida Bar No. 1002715
ALEX KAPLAN*
Florida Bar No. 1030761
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
sastley@rgrdlaw.com
arees@rgrdlaw.com
acohen@rgrdlaw.com
akaplan@rgrdlaw.com

EDELSBERG LAW
SCOTT EDELSBERG*
Florida Bar No. 100537
GABRIEL MANDLER*
Florida Bar No. 1002499
OMER KREMER*
20900 NE 30th Avenue, Suite 417
Aventura, FL 33180
Telephone: 786/289-9471
scott@edelsberglaw.com
gabriel@edelsberglaw.com
omer@edelsberglaw.com
*Attorneys for Plaintiffs and the Proposed Class*


* *Pro hac vice forthcoming*